**BECKER & POLIAKOFF LLP**
Helen Davis Chaitman hchaitman@bplegal.com
Peter W. Smith psmith@bplegal.com
Julie Gorchkova jgorchkova@bplegal.com
45 Broadway
New York, New York 10006
Telephone (212) 599-3322

*Attorneys for Defendants Listed on*
*Exhibits A & B Attached to Notice of*
*Motions to Dismiss*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>     Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>DEFENDANTS LISTED ON EXHIBITS A and B ATTACHED TO THE NOTICE OF MOTIONS TO DISMISS,<br><br>     Defendants. | Adv. Pro. Nos. listed on Exhibits A and B to Notices of Motion to Dismiss |

<u>**DEFENDANTS' OMNIBUS MEMORANDUM OF LAW**</u>
<u>**IN SUPPORT OF MOTIONS TO DISMISS**</u>

{N0034772 15 }

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................ 1

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY....................................... 4

     I.     Statement of Facts.............................................................................. 4

     II.    Procedural Posture ............................................................................ 5

ARGUMENT .............................................................................................................. 5

     I.     The Trustee's Financial Stake in his Quasi-Governmental
             Decisions Violates Defendants' Due Process Rights.............................. 5

     II.    The Complaints Violate SIPA § 78fff-2(c)(3) ...................................... 8

     III.   The Trustee Lacks Article III Standing to Pursue the Claims
             Asserted in the Complaints .................................................................. 11

             A.     Article III Standing Requirements ............................................ 11

             B.     As a Matter of Law, the Trustee Cannot Establish Injury ......... 13

             C.     SIPA Standing Cannot Create Article III Injury....................... 16

     IV.   The Court Lacks Constitutional Authority to Render Final
             Adjudications in the Avoidance Actions Commenced Against the
             Exhibit A Defendants............................................................................ 19

     V.    The Court Lacks Jurisdiction With Respect to Avoidance Actions
             Commenced Against Exhibit B Defendants .......................................... 20

     VI.   The Trustee's Calculation of Defendants' Clawback Exposure
             violates the Defendants' Due Process Rights ....................................... 22

     VII.  The Trustee's Claims Must Be Dismissed Because He Has Not
             Established that the Transfers were Made with the Intent to
             Defraud Creditors................................................................................ 25

     VIII. The Trustee's Complaints Violate New York Public Policy ................. 28

     IX.   The Trustee's Claims to Avoid Obligations Must be Dismissed.......... 30

A.    SIPA Does Not Authorize Avoidance of Obligations ............................... 30

B.    The Trustee Cannot Avoid Obligations that Arise By Law ...................... 32

C.    The Complaints Fail to Adequately Plead the Obligations to be Avoided .................................................................................................. 33

D.    The Trustee Cannot Avoid Transfers Made Or Obligations Incurred Before The Reach-Back Period .................................................. 34

E.    The Trustee Cannot Avoid Obligations Already Satisfied ....................... 34

X.    The Trustee Improperly Combines Accounts ........................................................ 35

A.    SIPA Rules Require That Accounts Be Treated Separately .................... 35

B.    The Claims Do Not Meet the Pleading Requirements ............................. 36

XI.    The Trustee's Subsequent Transfer Claims Should be Dismissed ....................... 36

C.    The Claims Against Subsequent Transferees are not Adequately Pled .......................................................................................... 37

D.    The Trustee Cannot Convert Subsequent Transferees into Beneficiaries of an Initial Transfer ......................................................... 38

XII.    The Trustee Cannot Disallow Unidentified Related Claims ................................ 41

XIII.    Applicable Non-Bankruptcy Law Protects Transfers and Distributions from Defendants' Accounts ............................................................ 42

XIV.    The Trustee's Actions Against Charitable Trusts Violate Free Exercise of Religion ............................................................................................. 44

CONCLUSION ...................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 1031 Tax Group LLC*, 439 B.R. 47 (Bankr. S.D.N.Y. 2010) ..................................... 26

*In re Adam Furniture Industries, Inc.*, 191 B.R. 249 (Bankr. S.D. Ga. 1996)................... 15

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986) ............................................................. 6

*Allen v. Wright,* 468 U.S. 737 (1984).......................................................................... 12, 13

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291 (2006) ........................31

*In re Asia Global Crossing*, 333 B.R. 199 (Bankr. S.D.N.Y. 2005) .......................31, 32, 34

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150 (1970) .......................12

*Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220 (1st Cir. 2003) ................................31

*Bakst v. Wetzel (In re Kingsley)*, 2007 WL 1491188 (Bankr. S.D. Fl. May
    17, 2007), *aff'd by* 518 F. 3d 874 (11th Cir. 2008) ....................................................... 24

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) ....................................29, 30

*Barnes v. Hirsch*, 215 A.D. 10, 212 N.Y.S. 536 (1st Dep't 1925), *aff'd,* 242
    N.Y. 555, 152 N.E. 424 (1926)...................................................................................... 18

*Barnhill v. Johnson*, 503 U.S. 393 (1992) ........................................................................28

*Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190 (S.D.N.Y. 2002) ...................................28

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Investment Fund
    Ltd.)*, 397 B.R. 1 (S.D.N.Y. 2007) ............................................................................... 25

*Begier v. I.R.S.*, 496 U.S. 53 (1990) ................................................................................. 16

*Belford v. Cantavero (In re Bassett)*, 221 B.R. 49 (Bankr. D.Conn. 1998)......................24

*In re Bennett*, 154 B.R. 126 (N.D.N.Y. 1992) ...................................................................20

*Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. 880 (D. N.J. 1988)......................... 10

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) ...................................................28, 29

*Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988)..............39, 40

*Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.),* 336 F.3d 94 (2d Cir.2003) ................................................................ 18

*In re Bullion Reserve of N. Am.,* 922 F.2d 544 (9th Cir. 1991) ........................................40

*Butner v. United States,* 440 U.S. 48 (1979) ...................................................... 28

*Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868 (2009) ...................................... 6, 7

*Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416 (1972) .............................. 14, 15

*Carr v. Hoy,* 2 N.Y.2d 185 (1957)............................................................................14

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,* 433 F.3d 181 (2d Cir. 2005) ..................................................... 11

*Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52 (2d Cir. 1997).................................................................................................................. 39

*In re Cinematronics,* 916 F.2d 1444 (9th Cir. 1990) ...................................................... 22

*Commodities Future Trading Commission v. Walsh,* 17 N.Y.3d 162 (2011)............ 29, 30

*Congress Financial Corp. v. Levitan (In re Levitan),* 46 B.R. 380 (Bankr. E.D.N.Y. 1985) ...............................................................................................13

*In re Continental Capital Securities,* 2007 WL 5964307 (N.D. Ohio Sept. 19, 2007) .................................................................................................... 20

*Dahar v. Jackson (In re Jackson),* 318 B.R. 5 (D. N.H. 2004), *aff'd by* 459 F.3d 117 (1st Cir. 2006)................................................................................ 24

*Daly v. Kennedy (In re Kennedy),* 279 B.R. 455 (Bankr. D. Conn. 2002) ......................13

*Dobin v. Presidential Fin. Corp. of Delaware Valley (In re Cybridge Corp.),* 312 B.R. 262 (D.N.J. 2004)............................................................... 24

*In re Dreier LLP,* 452 B.R. 391 (Bankr. S.D.N.Y. 2011)................................................... 26

*Eberhard v. Marcu,* 530 F.3d 122 (2d Cir. 2008)............................................................. 26

*Ellison v. American Image Motor Co., Inc.,* 36 F. Supp. 2d 628 (S.D.N.Y. 1999) ......................................................................................................36, 38

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,* 651 F. 3d 327 (2d Cir. 2011)................................................................................................................30

*Enron Creditors Recovery Corp. v. J.P. Morgan Sec. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17 (Bankr. S.D.N.Y. 2009), *rev'd on other grounds, Alfa S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, 422 B.R. 423 (S.D.N.Y. 2009)..........................................................................................................40

*Fannie Mae v. Olympia Mortg. Corp.*, 2006 WL 2802093 (E.D.N.Y. Sept. 28, 2006) ...................................................................................... 33

*Flast v. Cohen,* 392 U.S. 83 (1968) ................................................................12

*Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957) ................................31

*In re Foxmeyer Corporation*, 290 B.R. 229 (Bankr. D. Del. 2003)................................. 32

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ......................................... 11

*GAF Holdings, LLC v. Rinaldi (In re Farmland Industries, Inc.),* 639 F.3d 402 (8th Cir. 2011).................................................................... 11

*Gladstone Realtors v. Village of Bellwood*, 44 U.S. 91 (1971) ......................................17

*In re Glenn*, 430 B.R. 56 (Bankr. N.D.N.Y. 2010) ........................................... 42

*Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Committee of Bayou Group*, 758 F.Supp.2d 222 (S.D.N.Y. 2010) ............................................................................ 24, 25

*In re Gov't Sec. Corp.*, 972 F.2d 328 (11th Cir. 1992).........................................31

*Gowan v. Amaranth LLC (In re Dreier LLP)*, 452 B.R. 451 (Bankr. S.D.N.Y. 2011).................................................................. 38

*Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467 (Bankr. S.D.N.Y. 2011).................................................................. 40

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ........................................ 20, 21

*Hatch v. Fourth Nat'l Bank*, 147 N.Y. 184 (1895)........................................... 29

*Hill v. Brad Hill & Associates, Inc. (In re Indian Capitol Distributing, Inc.)*, 2011 WL 4711895 (Bankr. N.M. Oct. 5, 2011).....................................12

*Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085 (2d Cir. 1995) ..................................12

*Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165 (Bankr. S.D.N.Y. 1998)................................................................... 24

*Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330 (10th Cir. 1996) ................................................................................................ 26

*In re Keil*, 88 F.2d 7 (2d Cir. 1937) .................................................. 42

*Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010)........................................................................................ 18

*Langenkamp v. Culp*, 498 U.S. 42 (1990)................................... 20, 21

*Lassman v. Patts (In re Patts)*, 2012 WL 1570812 (Bankr. D.Mass. May 4, 2012) ............................................................................................ 24

*Lewis v. Manufacturers National Bank*, 364 U.S. 603 (1961) ........................................ 28

*Luckett v. Bure*, 290 F.3d 493 (2d Cir. 2002) ................................. 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)....................11, 17

*In re M & L Business Mach. Co.*, 160 B.R. 851 (Bankr. D. Colo. 1993)............................ 16

*In re Madoff Securities*, 490 B.R. 46 (S.D.N.Y. 2013) ................ 19, 20

*In re Madoff Securities,* No. 12-mc-115, ECF No. 489 (S.D.N.Y. Oct. 15, 2013) ............................................................................................ 22

*McClure v. Carter*, 513 F. Supp. 265 (D. Idaho 1981) ......................17

*McClure v. Regan*, 454 U.S. 1025 (1981)........................................17

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006)....................... 33

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .......................................... 32

*Morgan v. Gordon*, 450 B.R. 402 (W.D.N.Y. 2011) ........................ 42

*Mosier v. Callister, Nebeder & McCullough*, 546 F.3d 1271 (10th Cir. 2008)........................................................................................... 19

*In re Nextwave Pers. Communications, Inc. v. FCC*, 200 F3d 43 (2d Cir. 1999) .................................................................................. 32, 34

*O'Shea v. Littleton,* 414 U.S. 488 (1974)....................................... 18

*O'Toole v. Karmani (In re Trisnsum Group, Inc.)*, 460 B.R. 379 (Bankr. S.D.N.Y. 2011)................................................................................ 34

*Official Comm. of Unsecured Creditors of Color Tile v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) ................................................. 19

*Official Comm. of Unsecured Creditors of PSA, Inc., v. Edwards,* 437 F.3d
   1145 (11th Cir. 2006)....................................................................... 19

*Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.),* 309 F.3d 1325
   (11th Cir. 2002)............................................................................ 26

*In re Ozark Restaurant Equipment Co. Inc.,* 816 F.2d 1222 (8th Cir. 1987) ...................15

*In re Park South Securities, LLC,* 326 B.R. 505 (Bankr. S.D.N.Y. 2005) ....................... 16

*Picard v. Bert Brodsky Associates, Inc. Pension Plan,* 10-ap-05148 (BRL),
   ECF No. 1 (Bankr. S.D.N.Y. Dec. 2, 2010)...................................................41

*Picard v. Cohmad Sec. Corp,* 454 B.R. 317 (Bankr. S.D.N.Y. 2011)..................................38

*Picard v. HSBC Bank PLC,* 454 B.R. 25 (S.D.N.Y. 2011) ....................................................31

*Picard v. JPMorgan Chase & Co.,* 721 F.3d 54 (2d Cir. 2013) ................................ *passim*

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87
   (Bankr. S.D.N.Y. 2011)................................................................... 37, 38

*Picard v. Trust For the Benefit of Ryan Tavlin,* No. 10-ap-05232 (BRL),
   ECF No. 1..................................................................................... 42

*Pivar v. Graduate Sch. of Figurative Art of the N.Y. Acad. of Art,* 290
   A.D.2d 212 (1st Dep't 2002) .........................................................13

*Raines v. Byrd,* 521 U.S. 811 (1997) ..................................................................17

*Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) ................................................ 10

*In re Schick,* 246 B.R. 41 (Bankr. S.D.N.Y. 2000)............................................ 16

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.,* 234 B.R.
   293 (Bankr. S.D.N.Y. 1999) ......................................................38, 39

*Sender v. Buchanan (In re Hedged-Investments Assocs., Inc.),* 84 F.3d
   1281 (10th Cir. 1996)....................................................................... 19

*Simon v. Eastern Kentucky Welfare Rights Org.,* 462 U.S. 26 (1976)............................12

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Greiff),* 476 B.R. 715
   (S.D.N.Y. 2012), *appeal pending, In re Madoff Sec.,* No. 12-2557-L (2d
   Cir.) ......................................................................................1, 2, 5, 43

*Southeast Waffles, LLC v. IRS (In re Southeast Waffles, LLC ),* 702 F.3d
   850 (6th Cir. 2012) ......................................................................... 32

*Stern v. Marshall*, 131 S. Ct. 2594 (2011) ................................................................. 20, 21

*Thomas v. City of New York*, 143 F.3d 31 (2d Cir.1998).................................................... 11

*Trefny v. Bear Stearns Securities Corp.*, 243 B.R. 300 (S.D. Tex. 1999)........................ 10

*Tumey v. State of Ohio*, 273 U.S. 510 (1927) ...................................................................... 6

*TZ Manor, LLC v. Daines*, 503 Fed. Appx. 82 (2d Cir. Nov. 27, 2012)........................... 22

*U.S. Bank N.A. v. Verizon Communs., Inc.*, 2012 WL 3100778 (N. Tex.
    July 31, 2012) ............................................................................................................ 32

*U.S. v. Manufacturers Trust Co.*, 198 F.2d 366 (2d Cir. 1952)........................................ 27

*United States v. Benitez*, 779 F.2d 135 (2d Cir. 1985) (Graafeiland, J.,
    concurring) ................................................................................................................ 14

*United States v. Central National Bank of Cleveland*, 429 F.2d 5 (8th Cir.
    1970).......................................................................................................................... 14

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) ........................... 10, 31

*United States v. Silvestri,* 409 F. 3d 1311 (11th Cir. 2005)................................................ 26

*Valley Forge Christian College v. Americans United for Separation of
    Church and State, Inc.*, 454 U.S. 464 (1982) ...................................................... 12, 13

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................... 11, 12, 13

*Wight v. BankAmerica Corp.,* 219 F.3d 79 (2d Cir. 2000) ................................................ 18

*Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir. 1988) ........................................ 15

*Withrow v. Larkin*, 421 U.S. 35 (1975) ................................................................................ 6

*U.S. ex. rel. Yellowtail v. Little Horn State Bank*, 828 F. Supp. 780
    (D.Mon. 1992)............................................................................................................ 17

## Statutes & Rules

17 C.F.R. 240.15c3-3..........................................................................................................13

17 C.F.R. § 240.10b-5 ........................................................................................................ 33

17 C.F.R. § 300.100(b)................................................................................................. 35, 36

17 C.F.R. § 300.104(b)....................................................................................................... 36

11 U.S.C. § 105(a)........................................................................................................ 23, 25

11 U.S.C. § 502(d) ................................................................................................41

11 U.S.C. § 541 ................................................................................................ 16

11 U.S.C. § 544 ............................................................................................ 15, 16

11 U.S.C. § 544(b) ..........................................................................................30

11 U.S.C. § 546(e) ................................................................................ 5, 22, 43

11 U.S.C. § 547(b) ........................................................................................ 16

11 U.S.C. § 548 ........................................................................................ 16, 28

11 U.S.C. § 548(a) ....................................................................................30, 32

11 U.S.C. § 548(a)(1) ................................................................... 14, 23, 32, 43

11 U.S.C. § 548(a)(1)(A) ....................................................................1, 5, 25, 26

11 U.S.C. § 548(a)(2) ..................................................................................20, 44

11 U.S.C. § 548(c) ........................................................................................ 39

11 U.S.C. § 550 ............................................................................................38

11 U.S.C. § 550(a) ..............................................................................3, 23, 38, 39

11 U.S.C. § 550(a)(1) ..................................................................................39, 40

11 U.S.C. § 550(a)(2) ....................................................................................1, 36

11 U.S.C. § 550(b) ........................................................................................ 39

11 U.S.C. § 550(d) ............................................................................ 23, 24, 25

15 U.S.C. § 78fff-1(b) ..................................................................................30

15 U.S.C. § 78fff-3 ......................................................................................41

15 U.S.C. § 78fff-1(b) ................................................................................ 35

15 U.S.C. § 78fff-2(b) ..................................................................................41

15 U.S.C. § 78fff-2(c)(1) ............................................................................8, 9

15 U.S.C. § 78fff-2(c)(3) ........................................................................... *passim*

15 U.S.C. § 78fff-3 ..................................................................................... 35

15 U.S.C. § 78fff-3(c)(1) ........................................................................... 9

15 U.S.C. § 78fff-3(c)(2) ........................................................................... 9

15 U.S.C. § 78fff(b) ........................................................................... 30, 35

15 U.S.C. § 78fff(d) ........................................................................... 9

15 U.S.C. § 78ffff(a)(1)(B) ........................................................................... 41

15 U.S.C. § 78fff–1(a) ........................................................................... 16

15 U.S.C. § 78j ........................................................................... 33

28 U.S.C. § 157(e) ........................................................................... 22

Fed. R. Bankr. P. 7008(a) ........................................................................... 36

Fed. R. Bankr. P. 7009 ........................................................................... 33

Fed. R. Bankr. P. 7012 ........................................................................... 1

Fed. R. Civ. P. 8(a) ........................................................................... 36, 37

Fed. R. Civ. P. 9(b) ........................................................................... 33, 36, 38

Fed. R. Civ. P. 12(b) ........................................................................... 1

Fed. R. Civ. P. 12(b)(1) ........................................................................... 11

N.Y. C.P.L.R. § 5001(a) ........................................................................... 33

N.Y. C.P.L.R. § 5202(d) ........................................................................... 43

N.Y. C.P.L.R. § 5205 ........................................................................... 42

N.Y. C.P.L.R. § 5205(c) ........................................................................... 42

N.Y. C.P.L.R. § 5205(c)(2) ........................................................................... 43

N.Y. C.P.L.R. § 5205(c)(5) ........................................................................... 43

N.Y. C.P.L.R. § 5205(c)(5) ........................................................................... 43

Religious Freedom Restoration Act . 42 U.S.C. §2000bb-4 ........................................................................... 44, 45

Religious Liberty and Charitable Donation Act of 1998 ........................................................................... 44, 45

**Other Authorities**

Carlyn Kolker and Christopher Scinta, "Madoff Trustee Picard May Take
      Five Years to Pay Back Investors" ................................................................................ 7

5 COLLIER ON BANKRUPTCY ¶ 548.03[4][a] (16th ed. 2011) .............................................. 35

5 COLLIER ON BANKRUPTCY ¶ 548.11[1][a][ii] (16th ed. 2011) ........................................... 33

David D. Siegel, New York Practice § 490 (5th ed. 2011). ................................................ 42

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 370-71 (1977) .................................................15

**INTRODUCTION**

Defendants listed on Exhibits A and B to the Notices of Motion to Dismiss (respectively, the "Exhibit A Defendants" and the "Exhibit B Defendants" and, together, the "Defendants"), by their undersigned counsel, submit this memorandum of law in support of their motions to dismiss the complaints and/or amended complaints (the "Complaints") filed in their respective adversary proceedings, pursuant to Rule 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure (the "Rules") made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**PRELIMINARY STATEMENT**

These lawsuits are some of more than 1,000 actions commenced in December 2010 by Irving H. Picard (the "Trustee"), as Trustee in the proceeding for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA") in which the Trustee seeks to recover from innocent customers the alleged fictitious profits they received from BLMIS after entrusting their life savings to BLMIS.

Although the Complaints allege avoidance claims asserted under various provisions of the Bankruptcy Code (the "Code") and New York's Debtor & Creditor Law, as a result of rulings in the district court, the Trustee's only remaining claims are those under § 548(a)(1)(A) of the Code, which permits avoidance of fraudulent transfers made with actual fraudulent intent during the two-year federal reach-back period (the "Reach-Back Period" or "Two-Year Period") and subsequent transferee claims asserted pursuant to § 550(a)(2). *See SIPC v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Greiff)* ("*Greiff*"), 476 B.R. 715, 722 (S.D.N.Y. 2012) ("The Court concludes . . . that § 546(e) bars the Trustee from pursuing the claims here made under § 548(a)(1)(B) and § 544."), *appeal pending, In re Madoff Sec.,* No. 12-2557-L (2d Cir.). The Trustee's state law claims, which sought to avoid transfers made during a

six-year reach-back period, and preference claims were dismissed.  *Id*.  Defendants now move to dismiss the Trustee's remaining claims based on one or more of the following grounds:

1.     The Trustee, who acted in a quasi-governmental capacity at the time he filed the Complaints against the Defendants, has conceded that he receives as compensation from his law firm, Baker & Hostetler LLP ("B&H"), a percentage of the fees paid by SIPC to B&H.  Hence, under United States Supreme Court authority, the Trustee's financial stake in his quasi-governmental decisions violates the Defendants' due process rights.

2.     Under SIPA, a trustee has no power to utilize the avoidance provisions of the Code unless and until the fund of customer property is insufficient to pay all allowed customer claims.  *See* 15 U.S.C. § 78fff-2(c)(3).  The Trustee has allowed claims of approximately $11.388 billion but is currently holding in the fund of customer property the sum of $11.7 billion.  Thus, under the plain language of SIPA, the Trustee has no authority to sue the Defendants.

3.     The Trustee lacks standing under Article III of the United States Constitution to bring the claims asserted in the Complaints because he lacks "injury in fact."  As the Second Circuit has recognized, BLMIS was required to hold customers' money in custody and, thus, neither BLMIS nor the Trustee could take title to the money that the Trustee concedes was stolen from BLMIS customers.  Those funds never became BLMIS' property and the Trustee, standing in BLMIS' shoes, has no right to recover those funds.

4.     The Court lacks jurisdiction to adjudicate these avoidance actions.  As to Exhibit A Defendants, who filed net equity claims against the BLMIS estate in this Court, the Court is limited to rendering proposed findings of facts and conclusions of law that must be reviewed by the district court *de novo*.  As to the Exhibit B Defendants, who did not file net equity claims, the Court lacks jurisdiction even to consider the Trustee's claims.

5.      The Trustee's method of calculating the Defendants' exposure violates their substantive due process rights.  The Trustee's failure to credit the Defendants, dollar-for-dollar, with deposits made during the life of their accounts and with inter-account transfers they received during the life of their accounts,  circumvents the protections to which they are entitled under the applicable statute of limitations.

6.      The Complaints must be dismissed because the transfers were not made with the intent to defraud the creditors.  BLMIS was not a Ponzi scheme and, hence, the Trustee cannot rely on the Ponzi scheme presumption to establish an "intent to defraud" creditors.

7.      Under state law, which controls the determination of Defendants' property rights, the Complaints must be dismissed.

8.      The Trustee has no power to avoid obligations.  The plain language of § 78fff-2(c)(3) of SIPA permits the recovery only of "property transferred" to the extent that such "transfers" are avoidable under the Code.  SIPA does not make, and has never made, any mention of any power to avoid "obligations."  In addition, the  Code does not give the Trustee the power to avoid obligations that arise by operation of law, to avoid obligations that have already been satisfied, to avoid obligations that arose under any circumstances before the governing statutory reach-back period.  Finally, the Trustee failed to plead any particular obligations to be avoided as required under the most liberal pleading rules.

9.      The Trustee's claims against alleged subsequent transferees fail to particularize any transfers to be avoided and recovered with the requisite specificity.  In addition, the Trustee misreads the nature and purpose of the "for the benefit of language" in § 550(a) of the Code, which traditionally reaches guarantors and persons in a similar relationship of liability.

10.    The Trustee's claims improperly seek to avoid amounts withdrawn from trust accounts that are protected from potential judgment creditors.

11.    Finally, the Trustee's claims against charitable trusts are violative of the laws and policies that protect exercise of religious freedom and charitable contributions.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

**I.    Statement of Facts**

BLMIS was a securities broker-dealer registered with the SEC and regulated under the Securities Exchange Act. (*See e.g., Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 10-ap-04352, ECF No. 26 (the "RAR Am. Compl."), ¶ 24 (Bankr. S.D.N.Y. Dec. 14, 2011). BLMIS employed 200 people and operated as a single limited liability company that engaged in three lines of business: an investment advisory operation, a market making operation and a proprietary trading operation. (*Id.*) The Complaints allege that only the investment advisory operation was a sham. (RAR Am. Compl. ¶ 30.) The Trustee previously confirmed that the other parts of the BLMIS business were "largely involved in legitimate trading with institutional counterparties." *In re Bernard L. Madoff*, No. 08-01789 (BRL), ECF. No. 524-1 (Declaration of Joseph Looby In Support of Trustee's Motion for Order Upholding Trustee's Determination Denying Customer Claims For Amounts Listed On Last Customer Statement), ¶ 28 (Bankr. S.D.N.Y. July 9, 2009).

As of the commencement of the SIPA liquidation, the brokerage firm had legitimate trades and securities positions outstanding that ultimately yielded proceeds of more than $334 million. *In re Bernard L. Madoff*, No. 08-01789 (BRL), ECF No. 314 (Trustee's First Interim Report), ¶¶ 30-34 (Bankr. S.D.N.Y. July 9, 2009). In addition, the Trustee successfully sold the BLMIS market making operation for nearly $25 million. (*Id.* ¶¶ 24-28.)

The Trustee has never alleged that any part of BLMIS' operations was fraudulent other than the investment advisory business which utilized only 12 of BLMIS' 200 employees. There

is no dispute that each Defendant – in whatever capacity each is alleged to have been a transferee in these actions – was an innocent transferee of the alleged transfers.

The Exhibit A Defendants filed net equity claims with this Court against the BLMIS estate. No such claims were filed by the Exhibit B Defendants.

## II.    Procedural Posture

BLMIS was placed into a SIPA liquidation on December 12, 2008 (RAR Am. Compl. ¶ 14.) The Trustee was thereafter appointed to conduct the liquidation. (*Id.* ¶¶ 15-17.)

After these actions were filed, the district court withdrew the reference on several specific issues and held, *inter alia,* that the Trustee's avoidance powers were limited by § 546(e) of the Code to claims under § 548(a)(1)(A). *See Greiff*, 476 B.R. at 722. An appeal by the Trustee from that ruling is pending in the Second Circuit. *See In re Madoff Sec.,* No. 12-2557-L (2d Cir.). The district court also withdrew the reference in various proceedings to consider a consolidated motion to dismiss based on various aspects of the antecedent debt/value defense. Since his ruling, the district court directed that the Defendants' actions be returned to this Court. The Trustee's remaining claims seek to recover under Code § 548(a)(1)(A) the alleged fictitious profits paid by BLMIS during the Two-Year Period.

## ARGUMENT

## I.    The Trustee's Financial Stake in his Quasi-Governmental Decisions Violates Defendants' Due Process Rights

The Trustee affirmatively led the public to believe that he has not personally received as compensation even the Trustee's fees paid to B&H since his appointment. At the hearing on his first fee application, the Trustee stated as follows:

> As noted at paragraph 33 of my application and contrary to the implication of certain objections that have been filed with the Court and before the press, the amounts that will be rewarded either today or at another time are going to be turned over to Baker

> Hostetler, the firm of which I am a partner. I want to emphasize I
> will not retain any portion of the award.[1]

However, on June 1, 2011, the Trustee finally admitted in open court that he is compensated in the amount of a percentage of the fees paid to B&H by SIPC, although he did not disclose the percentage he is paid.[2]  It is believed the percentage is 15%.  Thus, the Trustee has personally enriched himself by taking the unprecedented position that he has the statutory authority to sue thousands of innocent Madoff victims in separate adversary proceedings at a cost to SIPC of hundreds of millions of dollars.

The Trustee's financial interest in his official functions constitutes a violation of the Defendants' right to due process of law.  *See Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009) (litigant's due process rights are violated where judge accepted $3 million contribution to his election campaign from party litigant); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (due process concerns exist when "the probability of actual bias on the part of the . . . decisionmaker is too high to be constitutionally tolerable); *Tumey v. State of Ohio*, 273 U.S. 510 (1927) (compensation structure under which mayor-judge received salary supplement only upon convicting defendant violated due process); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986) (internal citations omitted) (proper inquiry is whether financial stake "would offer a possible temptation[,]" and not whether individual was actually influenced).  The Trustee's conflict of interest is exacerbated by the fact that he has successfully argued to this Court that the Court has no authority to review the fees of B&H for reasonableness once SIPC approves them (which it has done

---

[1] Declaration of Helen Davis Chaitman, Esq. (the "Chaitman Decl."), Ex. 1 (8/6/09 Hrg. Trans.) at 14:15-21.

[2] Chaitman Decl., Ex. 2 (6/1/11 Hrg. Trans.) at 32:20-23.

throughout the SIPA liquidation).  Thus, SIPC, whose members have been enriched by the Trustee's violations of SIPA, can control the Trustee's compensation and that of his law firm.

As the "decision-maker" for SIPC, a quasi-governmental agency, the Trustee is acting in a quasi-governmental capacity.[3]  Moreover, the Department of Justice appointed the Trustee as a special master to distribute funds forfeited to the United States by Madoff co-conspirators Carl Shapiro and the Picower parties.  In a press release dated December 17, 2010 the Government stated:

> The United States Attorney's Office will use funds forfeited in the settlement announced today to compensate victims of Madoff's fraud.  Last week, in connection with a $625 million settlement involving the Office, the SIPA Trustee, and Carl Shapiro and his family, Mr. Bharara announced that the Department of Justice had appointed Irving H. Picard as Special Master to oversee the process of remission or mitigation under the forfeiture laws. [4]

As a quasi-governmental figure, the Trustee is not "'allowed to be a judge in his own cause because his interest would certainly bias his judgment and, not improbably, corrupt his integrity.'" *Caperton*, 556 U.S. at 876-77 (quoting The Federalist No. 10, p. 59 (J. Cooke ed. 1961) (J. Madison)).  Constitutional due process violations implicated as a result of the Trustee's 15 percent interest in the fees paid to B&H by SIPC require dismissal of the Complaints.

---

[3] Chaitman Decl., Ex. 3 (March 10, 2011 Testimony of SEC Chairwoman Mary Shapiro before the House Committee on Oversight and Government Reform (testifying that the Trustee and not the SEC makes the decision to clawback from innocent investors)); *see also* Carlyn Kolker and Christopher Scinta, "Madoff Trustee Picard May Take Five Years to Pay Back Investors" dated January 21, 2009, available at Bloomberg.com, at 1 (quoting SIPC's President Stephen Harbeck identifying the Trustee as the decision-maker.)

[4] Chaitman Decl., Ex. 4 (United States Department of Justice, Southern District of New York Press Release, "Manhattan U.S. Attorney Announces Agreement to Recover $7.2 Billion for Victims of Bernard L. Madoff's Ponzi Scheme from Estate of Jeffry M. Picower,") at 4.

## II.    The Complaints Violate SIPA § 78fff-2(c)(3)

The Trustee has violated SIPA – and caused untold devastation to the Defendants, whose lives were decimated by Madoff's fraud -- by utilizing the avoidance provisions of the Code to sue innocent investors despite the fact that he is holding sufficient money in the fund of customer property to pay all allowed customer claims, inclusive of the SIPC advances.  Congress specifically mandated that the lives of securities customers would not be upset by the initiation of avoidance actions except where necessary to pay allowed customer claims.  The Complaints violate that mandate.

A SIPA trustee has the power to use the avoidance provisions of the Code to recover property only when there are insufficient funds in the estate to pay allowed customer claims and reimburse SIPC for the amounts paid in SIPC insurance:

> **Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1)**, the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11.  (emphasis added.)

15 U.S.C. § 78fff-2(c)(3).

In instituting the actions against the Defendants, the Trustee relies for his statutory authority on SIPA § 78fff-2(c)(3).  He makes the following allegation in all of the Complaints:

> [T]he Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme.  **Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).**

*See e.g.,* RAR Am. Compl. ¶ 20 (emphasis added).

Section 78fff-2(c)(1)(A) – (D) of SIPA sets forth the claims that must be satisfied from the fund of customer property.  If the fund of customer property is sufficient to satisfy the following claims, then the Trustee has no power to institute avoidance actions:

> **(A)** first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;

> **(B)** second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

> **(C)** third, to SIPC as subrogee for the claims of customers;

> **(D)** fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(2) of this title.

The Trustee has acknowledged that only the second and third priorities of distribution are applicable in this case, *i.e.*, categories "B" and "C."  *In re Bernard L. Madoff*, No. 08-01789, ECF No. 4048 (Motion for an Order Approving Initial Allocation of Property to the Fund of Customer Property and Authorizing an Interim Distribution to Customers (the "Interim Distribution Motion")), ¶ 38 (Bankr. S.D.N.Y. May 4, 2011).

As of October 25, 2013, the Trustee has determined all claims received. <http://www.madofftrustee.com/claims-03.html>.  He has allowed claims totaling $11.388 billion on which SIPC has advanced a total of $707.4 million.  (*Id.*)  Thus, if the Trustee had $11.388 billion in the fund of customer property, he could not use the avoidance provisions of the Code.  *See* 15 U.S.C. § 78fff-2(c)(3).

The fund of customer property now consists of approximately $11.7 billion.  The Trustee represents that the fund of customer property is approximately $9.5 billion.  <http:// www. madofftrustee.com/recoveries-04.html>.  In his calculation, however, the Trustee does not in-

clude $2.2 billion forfeited to the Government by the Picower parties, even though he previously represented that "every penny" of the $7.2 billion settlement with the Picower parties would be distributed to customers.[5]   Thus, the Trustee has $11.7 billion in the fund of customer property and he has allowed claims of less than $11.338 billion, leaving an excess of approximately $360 million.

Since SIPA § 78fff-2(c)(3) only authorizes a trustee to utilize the avoidance provisions of the Code when the fund of customer property is insufficient to pay the allowed customer claims, the Trustee is acting in direct contravention of SIPA by proceeding with the clawback suits.  *See Trefny v. Bear Stearns Securities Corp.*, 243 B.R. 300, 321 (S.D. Tex. 1999) ("Section 78fff-2(c)(3) comes into effect when the customer's property held by the debtor is not sufficient to pay customers' claims in full.").

The only decision directly on point is *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. 880 (D. N.J. 1988) which erroneously held, without any analysis, that the date for determining standing to sue is the date of filing of the SIPA liquidation.  This decision ignored the plain language of SIPA, under which the Complaints are barred.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (The Supreme Court's first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. [The] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'") (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989) (emphasis added)).

---

[5] *See* Release of Irving H. Picard, "$7.2 BILLION RECOVERY AGREEMENT WITH ESTATE OF JEFFRY PICOWER AND PICOWER-RELATED INVESTORS," dated December 17, 2010, at 1, available at <http://www. madofftrustee.com/statements-07.html>.

**III.   The Trustee Lacks Article III Standing to Pursue the Claims Asserted in the Complaints**

 **A.   <u>Article III Standing Requirements</u>**

 "A case is properly dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002) (internal quotation marks and citation omitted); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[F]ederal courts are under an independent obligation to examine their own jurisdiction."); *Thomas v. City of New York,* 143 F.3d 31, 34 (2d Cir.1998) (noting that because of the "Article III limitations on judicial power . . . the [C]ourt can raise [an Article III issue] *sua sponte,* and, indeed, can do so for the first time on appeal") (internal quotation marks omitted); *GAF Holdings, LLC v. Rinaldi (In re Farmland Industries, Inc.),* 639 F.3d 402 (8th Cir. 2011) (dismissing action for lack of standing where plaintiff did not have requisite injury).

 Article III, section 2 of the Constitution limits the subject-matter jurisdiction of federal courts to actual cases and controversies. *See Picard v. JPMorgan Chase & Co.,* 721 F.3d 54, 66 (2d Cir. 2013) ("*JP Morgan*"). An "essential and unchanging part of the case-or-controversy requirement of Article III" is the "core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If plaintiffs lack Article III standing, a court has no subject-matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

 The Second Circuit summarized the Article III standing requirement in *JPMorgan*:

> Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." . . . . Standing de-

> pends, first, on whether the plaintiff has identified a "case or con-
> troversy" between the plaintiff and the defendants within the
> meaning of Article III of the Constitution. . . . "To have standing,
> '[a] plaintiff must [1] allege personal injury [2] fairly traceable to
> the defendant's allegedly unlawful conduct and [3] likely to be re-
> dressed by the requested relief.'" . . . In addition, the plaintiff
> must comply with "prudential" limitations on standing, of which
> the salient one here is that a party must "assert his own legal rights
> and interests and cannot rest his claim to relief on the legal rights
> or interests of third parties."

721 F.3.d at 66 (2d Cir. 2013) (citing and quoting *Warth*, 422 U.S. at 498; *Ass'n of Data Pro-*

*cessing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970); *Hirsch v. Arthur Andersen & Co.*,

72 F.3d 1085, 1091 (2d Cir. 1995) (quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984)). As the

Supreme Court has held:

> [A]t an irreducible minimum, Art. III requires that the party who
> invokes the court's authority "<u>show that he personally has suffered
> some actual or threatened injury as a result of the putatively illegal
> conduct of the defendant</u>, [citation omitted], and that the injury
> "fairly can be traced to the challenged action" and "is likely to be
> redressed by a favorable decision[.]" . . . In this manner does Art.
> III limit the federal judicial power "to those disputes which confine
> federal courts to a role consistent with a system of separated pow-
> ers and which are traditionally thought to be capable of resolution
> through the judicial process."

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,

454 U.S. 464, 472 (1982) (emphasis added) (quoting *Simon v. Eastern Kentucky Welfare Rights*

*Org.,* 462 U.S. 26, 38, 41 (1976); *Flast v. Cohen,* 392 U.S. 83, 97 (1968)); *accord Hill v. Brad*

*Hill & Associates, Inc. (In re Indian Capitol Distributing, Inc.)*, 2011 WL 4711895 (Bankr. N.M.

Oct. 5, 2011) (dismissing adversary proceedings commenced by trustee where estate suffered no

injury).

On the issue of actual injury, the Supreme Court further held that "[t]he exercise of judi-

cial power, which can so profoundly affect the lives, liberty, and property of those to whom it

extends, <u>is therefore restricted to litigants who can show "injury in fact" resulting from the action</u>

which they seek to have the court adjudicate." *Valley Forge*, 454 U.S. at 473 (emphasis added).

A plaintiff bringing suit in federal court bears the burden of demonstrating standing. *See Allen*,

468 U.S. at 751. The Trustee cannot meet his burden of establishing jurisdiction unless he

demonstrates that he or the debtor has personally suffered some actual injury. *See Warth*, 422

U.S. at 501 (Article III requires that "plaintiff . . . allege a distinct and palpable injury to him-

self[.]"). The Trustee cannot satisfy that burden.

## B. **As a Matter of Law, the Trustee Cannot Establish Injury**

The Trustee cannot establish "injury in fact" because neither BLMIS nor the Trustee

could take title to the money that the Trustee concedes was stolen from the BLMIS customers.

BLMIS was required to hold the BLMIS customers' money in custody. *See* 17 C.F.R. 240.15c3-

3. Thus, that money never became BLMIS' property and the Trustee, standing in BLMIS' shoes,

has no right to recover that money. In fact, the stolen money belongs to the very BLMIS cus-

tomers whose money, according to the Trustee, funded the withdrawals of the Defendants whom

the Trustee has sued in these fraudulent transfer actions.

It is black letter law that a thief does not take title to stolen property and, hence, has no

interest in such property. As the Second Circuit held in *JP Morgan*, the Trustee was not a bailee

of BLMIS customer property because "Madoff (and, by extension, BLMIS) took the investment

money from the [C]ustomers in order to defraud them—and a thief is not a bailee of stolen prop-

erty." 721 F.3d at 73 (emphasis added) (citing *Pivar v. Graduate Sch. of Figurative Art of the

N.Y. Acad. of Art,* 290 A.D.2d 212, 213 (1st Dep't 2002) (holding that bailment relationship aris-

es if bailee takes "lawful possession" of property "without present intent to appropriate")); *ac-

cord Daly v. Kennedy (In re Kennedy),* 279 B.R. 455, 460 (Bankr. D. Conn. 2002) ("A thief does

not acquire good title to the property he steals . . ."); *Congress Financial Corp. v. Levitan (In re*

*Levitan),* 46 B.R. 380, 387 (Bankr. E.D.N.Y. 1985) (holding that alleged embezzler cannot have any interest in stolen funds).

Similarly, "it is the well-established law of New York that "[n]o one shall be permitted . . . to acquire property by his own crime." *United States v. Benitez,* 779 F.2d 135, 141 (2d Cir. 1985) (Graafeiland, J., concurring) (citing *Carr v. Hoy,* 2 N.Y.2d 185, 187 (1957)); *Hofferman v. Simmons,* 290 N.Y. 449, 454–58 (1943); *United States v. Herzfeld,* 271 F. Supp. 185, 188 (S.D.N.Y. 1967); *United States v. Pagan,* 140 F. Supp. 711, 713 (S.D.N.Y. 1955)); *accord United States v. Central National Bank of Cleveland,* 429 F.2d 5 (8th Cir. 1970) (holding that robber had no legal interest in stolen money) (cited with approval in *Benitez,* 779 F.2d at 139).

The Trustee's avoidance powers are strictly limited to transfers of "an interest of the debtor in property." *See* 11 U.S.C. § 548(a)(1). As the Second Circuit held, the funds deposited by the BLMIS customers into their accounts belonged at all times to the BLMIS customers, not to BLMIS. Any claims to recover the amounts deposited by the BLMIS customers and stolen by BLMIS belong to the BLMIS customers, not to the Trustee. Put another way, BLMIS never acquired an "interest" in those funds because, although the funds were entrusted to BLMIS, BLMIS stole them. Therefore, under the well-settled principle that a thief never acquires title to stolen property, the BLMIS transfers fall outside the Trustee's avoidance powers.

The Supreme Court has held that a bankruptcy trustee's standing has been carefully limited by Congress. In *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 428-30 (1972), the Supreme Court held that a Chapter 10 trustee had no standing under the Bankruptcy Act to assert claims of misconduct against a third party on behalf of the debtor's debenture holders because the Bankruptcy Act did not authorize a trustee to collect money not owed to the estate and

because the debtor had no claim against the indenture trustee but, instead, was *in pari delicto* with the indenture trustee.

The Second Circuit held that the Trustee is *in pari delicto* with Madoff and BLMIS and thus lacks standing to assert common law claims. *See JP Morgan*, 721 F.3d at 58. In the Complaints, the Trustee relies on § 544 for standing to bring suit. He has no such standing. When the Code was being drafted in 1977, a provision was inserted into a draft of § 544 that was specifically intended to overrule *Caplin* by giving a trustee the power to enforce a claim that any individual creditor or class of creditors had against a third party. *See* H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 370-71 (1977). But that provision was deleted from the draft and was not enacted into law. Accordingly, *Caplin* remains the law of the land under the revised Code. *See Williams v. California 1st Bank*, 859 F.2d 664, 666 (9th Cir. 1988) (holding that trustee lacked standing to bring claims on behalf of investors of fraudulent scheme even where investors assigned their claims to trustee).

The Eighth Circuit explained the significance of this legislative history and the absence of any explicit statutory provision overruling the Supreme Court's *Caplin* decision.

> As originally proposed by the House, Section 544 was to contain a subsection (c), which was intended to overrule *Caplin*. It is extremely noteworthy, however, that this provision was deleted before promulgation of the final version of Section 544. Because subsection (c), as a part of Section 544, would have applied to both reorganization and liquidation trustees, and because Congress refused to enact subsection (c), we believe Congress' message is clear- *no* trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee as in the present case, has power under Section 544 of the Code to assert general causes of action, such as the alter ego claim, on behalf of the bankrupt estate's creditors.

*In re Ozark Restaurant Equipment Co. Inc.*, 816 F.2d 1222, 1227-28 (8th Cir. 1987) (emphasis added; footnotes omitted); *accord In re Adam Furniture Industries, Inc.*, 191 B.R. 249, 255-56

(Bankr. S.D. Ga. 1996) (recognizing that § 544 does not confer standing to pursue general causes of action on behalf of creditors).

Thus, under existing law, Defendants' funds never became property of BLMIS and the Trustee has no standing to assert those claims. *See Begier v. I.R.S.*, 496 U.S. 53 (1990) (holding that debtor's payment of taxes collected from customers were not transfers of "property of the debtor," but were instead transfers of customer property held in trust); *In re Schick*, 246 B.R. 41, 44-45 (Bankr. S.D.N.Y. 2000) (recognizing that "[t]he equitable title or interest is neither "property of the estate" under section 541 nor "property of the debtor" under section 547(b)").

The result might be different if BLMIS customers had purchased <u>equity</u> interests in BLMIS and given BLMIS control over their funds because then, arguably, BLMIS might have had an interest in the funds that were invested. *See, e.g., In re M & L Business Mach. Co.*, 160 B.R. 851, 856-57 (Bankr. D. Colo. 1993) (dishonest debtor who obtained funds through equity investors in debtor acquired "interest" in funds for purposes of 11 U.S.C. § 548). But that never happened here. Instead, the BLMIS customers entrusted their money to an SEC-regulated broker/dealer with specific instructions as to how the funds should be invested and consistent with the requirement that their funds be held in custody.

Thus, BLMIS held the customers' funds as a fiduciary of BLMIS customers, including the Defendants. Therefore, just as BLMIS could not sue the Defendants to recover funds entrusted to it, the Trustee lacks standing to sue under the fraudulent transfer laws.

### C.  SIPA Standing Cannot Create Article III Injury

The Trustee will undoubtedly argue that he has standing under 15 U.S.C. § 78fff–1(a) which provides that a "[SIPA] trustee shall be vested with the same powers and title with respect to the debtor and property of the debtor, including the same right to avoid preferences, as a trustee in a case under Title 11." The Trustee will also surely rely upon *In re Park South Securities,*

*LLC*, 326 B.R. 505, 512-13 (Bankr. S.D.N.Y. 2005), which erroneously construed the above provision as authorizing a SIPA trustee to assert fraudulent transfer claims. In *JP Morgan*, the Second Circuit explicitly rejected the Trustee's reliance on that SIPA provision as a basis for standing to sue financial institutions on behalf of BLMIS investors on grounds equally applicable here, holding that "the statute does not confer upon SIPA trustees a power, denied all other bankruptcy trustees, to sue third parties on claims that belong to persons other than the estate." 721 F.3d at 71-72.

SIPA is no substitute for the actual injury required under Article III.  As the Supreme Court held in numerous cases, the existence of a particularized injury under Article III cannot be conferred by Congress.  "It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."  *Raines v. Byrd,* 521 U.S. 811, 820, n. 3 (1997); *accord Lujan*, 504 U.S. 555 (1992) (respondents had no standing even though a statute conferred standing because no particularized injury existed); *U.S. ex. rel. Yellowtail v. Little Horn State Bank*, 828 F. Supp. 780, 785 (D.Mon. 1992) (Congressional grant of right of action is insufficient to satisfy Article III where no distinct injury exists).  "[A] statute cannot abrogate the Article III minima."  *Id.* at 785 (citing *Gladstone Realtors v. Village of Bellwood*, 44 U.S. 91, 100 (1971)).  "[A] naked statutory grant of standing, absent a 'distinct and palpable injury,' violates Article III."  *Id.* (quoting *McClure v. Carter*, 513 F. Supp. 265, 271 (D. Idaho 1981), *aff'd* without opinion, *McClure v. Regan*, 454 U.S. 1025 (1981)).

Thus, even where a statute grants a party standing to sue, courts must dismiss a complaint if the plaintiff cannot show "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."  *Gladstone Realtors,* 441 U.S. at 99

(1979); *accord O'Shea v. Littleton,* 414 U.S. 488, 493 n. 2 (1974) (Congressional grant of statutory standing does not obviate need to "show actual or threatened injury of some kind to establish standing in the constitutional sense"). Accordingly, the fact that SIPA authorizes the Trustee to utilize the avoidance powers of the Code does not give the Trustee Article III standing.

The Trustee will argue that his power to sue innocent BLMIS customers derives from some source other than SIPA. However, the Second Circuit has already rejected such arguments by the Trustee on the grounds that the *in pari delicto* doctrine and the *Wagoner* rule bar the Trustee's claims because BLMIS' misconduct is imputed to the Trustee:

> Under New York law, one wrongdoer may not recover against another. *See Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941, 950 (2010). The principle that a wrongdoer should not profit from his own misconduct "is ... strong in New York." *Id.,* 912 N.Y.S.2d 508, 938 N.E.2d at 964. The New York Appellate Division, First Department, has long applied the doctrine of *in pari delicto* to bar a debtor from suing third parties for a fraud in which he participated. *See Barnes v. Hirsch,* 215 A.D. 10, 212 N.Y.S. 536, 539 (1st Dep't 1925) ("The bankrupts could not recover against these defendants for bucketing orders because they were responsible for the illegal transaction and parties to the fraud."), *aff'd,* 242 N.Y. 555, 152 N.E. 424 (1926).
>
> ***
>
> The debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative. *See Wight v. BankAmerica Corp.,* 219 F.3d 79, 87 (2d Cir. 2000) ("[B]ecause a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in."); *accord Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.),* 336 F.3d 94, 99–100 (2d Cir.2003) (applying *Wagoner* rule in the context of "the greatest Ponzi scheme [then] on record" and holding that "the defrauded investors and not the bankruptcy trustee" were entitled to pursue malpractice claims against attorneys and accountants arising from the fraud).
>
> ***

> It is not possible thus to separate BLMIS from Madoff himself and his scheme.

*JP Morgan*, 721 F.3d at 63-65 (emphasis added).

Under the *in pari delicto* doctrine, a trustee cannot recover from third parties for wrongs of the debtor or in which the debtor was complicit. *See e.g., Official Comm. of Unsecured Creditors of PSA, Inc., v. Edwards,* 437 F.3d 1145, 1156 (11th Cir. 2006) (individual creditors damaged by debtor's Ponzi scheme – but not the trustee – could separately pursue claims against third parties free from bar of *in pari delicto*); *Mosier v. Callister, Nebeder & McCullough*, 546 F.3d 1271, 1276 (10th Cir. 2008) ("[I]t is well established that *in pari delicto* may bar an action by a bankruptcy trustee against third parties who participated in or facilitated wrongful conduct of the debtor."); *Sender v. Buchanan* (*In re Hedged-Investments Assocs., Inc.*), 84 F.3d 1281, 1284 (10th Cir. 1996) (barring trustee's state law claim based on "the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction") (citations and internal quotation marks omitted); *Official Comm. of Unsecured Creditors of Color Tile v. R.F. Lafferty & Co.,* 267 F.3d 340, 360 (3d Cir. 2001) (creditors' committee, having status of debtor corporation, was *in pari delicto* with sole shareholders).

Therefore, the doctrine of *in pari delicto* would also bar the Trustee from suing the Defendants, even if he could establish standing.

## IV.    The Court Lacks Constitutional Authority to Render Final Adjudications in the Avoidance Actions Commenced Against the Exhibit A Defendants

The district court has already determined that "[r]esolution of an avoidance action brought under SIPA . . . require[s] an exercise of the judicial power reserved for Article III courts." *See In re Madoff Securities*, 490 B.R. 46, 52 (S.D.N.Y. 2013). The court further concluded that the filing of a net equity claim in and of itself does not confer upon this Court the

power to finally adjudicate the Trustee's avoidance action. *See id.* at 54 (reasoning that the court had "no 'reason to believe that the process of adjudicating' net equity claims 'would necessarily resolve' the Trustee's avoidance actions.") (quoting *Stern v. Marshall*, 131 S. Ct. 2594, 2617 (2011)). Accordingly, even though the Exhibit A Defendants filed SIPC claims, this Court does not have the authority to finally adjudicate the claims asserted against the Defendants. At most, the Court can issue proposed findings of fact and conclusions of law, which the district court must then review *de novo*. *See In re Madoff Securities*, 490 B.R. at 57 ("Bankruptcy Courts are still free to issue proposed findings of fact and conclusions of law with respect to the initial avoidance actions").

## V.     The Court Lacks Jurisdiction With Respect to Avoidance Actions Commenced Against Exhibit B Defendants

It is well-established that a bankruptcy court does not have jurisdiction to adjudicate avoidance actions against a non-creditor. In *Granfinanciera, S.A. v. Nordberg*, while primarily examining non-creditors' right to a jury trial on fraudulent conveyance claims, the Supreme Court specifically stated that fraudulent conveyance actions are akin to common law claims that must be adjudicated by an Article III court:

> Although the issue admits of some debate, a bankruptcy trustee's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2) seems to us more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions.

492 U.S. 33, 55-56 (1989); *C.f. In re Bennett*, 154 B.R. 126, 133 (N.D.N.Y. 1992) (noting that by filing claim against bankruptcy estate, claimant submits itself to equitable jurisdiction of bankruptcy court) (citing *Langenkamp v. Culp*, 498 U.S. 42, 43-45 (1990)); *accord In re Continental Capital Securities*, 2007 WL 5964307, *2 (N.D. Ohio Sept. 19, 2007) (holding that claimant submitted himself to bankruptcy court's jurisdiction by filing SIPA claim).

In discussing its 1989 *Granfinanciera* decision, the *Stern* Court reaffirmed that – at least as to a non-creditor – fraudulent conveyance claims must be adjudicated by an Article III court:

> In *Granfinanciera,* we rejected a bankruptcy trustee's argument that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a noncreditor in a bankruptcy proceeding fell within the "public rights" exception. We explained that, "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." *Id.* [492 U.S.] at 54–55, 109 S.Ct. 2782. We reasoned that fraudulent conveyance suits were "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Id.* at 56, 109 S.Ct. 2782. As a consequence, we concluded that fraudulent conveyance actions were "more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions."

*Stern*, 131 S. Ct. at 2614.

Accordingly, the Court lacks jurisdiction to hear the claims against the Exhibit B Defendants, who did not consent to this Court's adjudication of the Trustee's claims by filing net equity claims against the BLMIS estate.

Additionally, the Exhibit B Defendants undoubtedly have a right to a jury trial. *See Granfinanciera*, 492 U.S. at 36 (person who has not submitted a claim against bankruptcy estate has right to jury trial when sued by trustee to recover fraudulent transfers). Yet, the Court's authority to conduct jury trials is very limited:

> If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

28 U.S.C. § 157(e); *see In re Cinematronics*, 916 F.2d 1444, 1451 (9th Cir. 1990) ("[W]here a jury trial is required and the parties refuse to consent to bankruptcy jurisdiction, withdrawal of the case to the district court is appropriate.")  Because the Exhibit B Defendants intend to demand jury trials and will not consent to this Court conducting those trials, the actions commenced against the Exhibit B Defendants must be dismissed.

## VI.   The Trustee's Calculation of Defendants' Clawback Exposure violates the Defendants' Due Process Rights

"To plead a plausible substantive due process claim, a plaintiff must allege facts establishing (1) a cognizable property interest (2) that was invaded in an arbitrary and irrational manner." *TZ Manor, LLC v. Daines*, 503 Fed. Appx. 82, 84 (2d Cir. Nov. 27, 2012).  The Trustee is a quasi-governmental official.  (See Point I, *supra*.)  His method of calculating the BLMIS customers' clawback exposure --which sidesteps the statute of limitations-- violates the Defendants' substantive due process rights.  In calculating the BLMIS customers' clawback exposure, the Trustee has calculated the net deposits and withdrawals going back through generations over the life of the Defendants' accounts and the accounts of any transferors into the Defendants' accounts.  By virtue of this process, the Trustee is seeking to hold the Defendants liable for withdrawals taken by their grandparents 30 and 40 years ago.

The Trustee's calculation of the Defendants' exposure deprives them of the two-year statute of limitations under § 546(e).  The due process clause protects the Defendants against the Trustee's methodology.  The Trustee is limited to a claim for withdrawals taken only during the Reach-Back Period and then, only with a credit for deposits made by the Defendants within the Reach-Back Period.  While Judge Rakoff in *In re Madoff Securities,* No. 12-mc-115, ECF No. 489 (S.D.N.Y. Oct. 15, 2013), agreed with the Trustee on his calculation methodology, Judge

Rakoff did not consider that methodology in the context of the due process clause of the United States and New York Constitutions.

The Code provides that the "trustee may avoid any [fraudulent] transfer . . . that was made . . . on or within 2 years before the date of the filing of the petition[.]" 11 U.S.C. § 548(a)(1). Congress made a clear legislative determination that a transferee has no liability to a bankruptcy trustee after two years has elapsed from the date of a transfer. Clearly, if Congress had intended to create an exception for SIPA liquidations, Congress could have so provided. It did not. Thus, the Trustee has no power to recover transfers made before the Reach-Back Period. And the Trustee cannot do indirectly what he is prohibited from doing directly. Thus, he cannot net out deposits and withdrawals over the life of the account and the lives of the accounts of any transferors into the Defendants' accounts.

Put another way, as of the commencement of the Reach-Back Period, no Defendant had any liability to the Trustee and the Trustee is bound by the statement value of each Defendant's account as of December 8, 2006. Only withdrawals made during the Reach-Back Period, less deposits made within the two-year period, are recoverable.

The underlying goal of a fraudulent transfer action is to restore the estate to the condition it was in before the allegedly wrongful transfer. Because bankruptcy courts are courts of equity and because § 550(d) of the Code expressly prohibits a trustee from obtaining a double recovery, where the recipient of a fraudulent transfer has given value to the debtor during the fraudulent transfer period, courts have held that §§ 105(a) and 550(d) compel giving the defendant a credit to the extent the defendant transferred funds to the debtor during the fraudulent transfer period.

Section 550(a) authorizes a trustee to avoid various transfers for the benefit of the bankruptcy estate. This provision was enacted "to restore the estate to the financial condition it

would have enjoyed if the transfer has not occurred." *Hirsch v. Gersten (In re Centennial Tex-tiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (citations omitted); *Lassman v. Patts (In re Patts)*, 2012 WL 1570812, **8-9 (Bankr. D.Mass. May 4, 2012) (holding there can be no re-covery when there is no loss to the estate). A trustee's recovery, however, is limited by § 550(d) to only a single satisfaction. Thus, courts have consistently held that a good faith recipient of a fraudulent transfer that gives value to the debtor during the applicable reach-back period must be given a credit to the extent of that replenishment. *See Bakst v. Wetzel (In re Kingsley)*, 2007 WL 1491188, *3 (Bankr. S.D. Fl. May 17, 2007), *aff'd by* 518 F. 3d 874,878 (11th Cir. 2008) (quot-ing *Dobin v. Presidential Fin. Corp. of Delaware Valley (In re Cybridge Corp.)*, 312 B.R. 262, 271 (D.N.J. 2004)) (a trustee cannot recover "'from a transferee that has already returned to the estate that which was taken in violation of the Code.'"); *Belford v. Cantavero (In re Bassett)*, 221 B.R. 49, 55 (Bankr. D.Conn. 1998) (denying trustee recovery where avoidance action was satis-fied before commencement and any additional recovery would constitute windfall to the estate); *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5, 28 (D. N.H. 2004), *aff'd by* 459 F.3d 117 (1st Cir. 2006) (reducing judgment to extend defendant use proceeds of transfer to pay debtors' expens-es); *In re Patts,* 2012 WL 1570812, at *9 (same).

Judge Rakoff held that the *Kingsley* line of cases is not controlling in this District. How-ever, Judge Rakoff relied upon *Goldman Sachs Execution & Clearing, L.P. v. Official Unse-cured Creditors' Committee of Bayou Group*, 758 F.Supp.2d 222, 228 (S.D.N.Y. 2010), which is clearly distinguishable because the arbitration panel likely concluded that Goldman did not prove that it returned funds to the debtors. *Id.* at 229. Moreover, the court made clear that the arbitra-tion panel found that Goldman "far from being totally innocent of wrongdoing, failed to engage in the diligent investigation that would have revealed [the] fraud. **This is especially relevant to**

application of the double recovery theory, which is based on principles of equity that a court (or in this case the arbitration panel) may apply (or not apply) with considerable discretion." *Id*. (emphasis added).  Here, the Trustee has conceded that the Defendants acted in good faith.  Under these circumstances, §§ 550(d) and 105(a) compel reduction of the Defendants' exposure by the amounts they deposited into their accounts during the Reach-Back Period.

To take just two examples:  In *Picard v. Unflat*, the Trustee seeks to recover a withdrawal of $275,000 on August 22, 2007 without giving credit to the defendants for deposits they made after August 22, 2007 totaling $390,000.  Case No. 10-ap-5420 (BRL), ECF. No. 1 (Compl.), Ex. B (Bankr. S.D.N.Y. Dec. 10, 2010).  Similarly, in *Picard v. Schaffer*, the Trustee seeks to recover withdrawals of $425,000 taken within the two-year Reach-Back Period without giving the defendants credit for deposits made within that same period totaling $275,000.  Case No. 10-ap-05435 (BRL), ECF. No. 1 (Compl.), Ex. B (Bankr. S.D.N.Y. Dec. 2, 2010).

If BLMIS received "value" for a deposit made by a customer within the Reach-Back Period, then surely the customer gave "value" for that deposit.  Accordingly, the Trustee's "heads I win, tails you lose" methodology is punitive and violative of their due process rights.  Similarly, the Trustee's failure to give Defendants full credit for inter-account transfers received by Defendants prior to December 11, 2006 violates their due process rights because the Trustee is depriving them of the value of the transfer that the Trustee has no authority to avoid.

## VII. The Trustee's Claims Must Be Dismissed Because He Has Not Established that the Transfers were Made with the Intent to Defraud Creditors

In order to establish the actual intent required to void a transfer under § 548(a)(1)(A), courts employ the "Ponzi scheme presumption" under which a transfer made by a Ponzi schemer is, as a matter of law, made with intent to hinder, delay and defraud creditors.  *See  Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Investment Fund Ltd.),* 397 B.R. 1, 12 (S.D.N.Y. 2007) (if

Ponzi scheme presumption applies, "actual intent" for purposes of § 548(a)(1)(A) is established as a matter of law); *see also In re 1031 Tax Group LLC*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) (same), *In re Dreier LLP*, 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011) ("Courts have uniformly recognized a presumption of actual intent to defraud on the part of the transferor in the context of a Ponzi scheme."). However, not every transfer made by a Ponzi schemer is intentionally fraudulent. Certainly, a Ponzi schemer does not fraudulently transfer funds when he pays his landlord, his phone bill, or his taxes; that is, when he pays his <u>creditors</u>.

The only credible rationale for voiding transfers from Ponzi schemers is that the transfers are of purported profits and the transfers are made to equity investors in the Ponzi scheme. The theory there is that a Ponzi scheme is a non-existent business in which investors purchase <u>equity</u> interests where "monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *United States v. Silvestri,* 409 F. 3d 1311, 1317 n. 6 (11th Cir. 2005) (citations and internal quotations omitted) (emphasis added); *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008) ("A 'Ponzi scheme' typically describes a pyramid scheme where earlier <u>investors</u> are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses") (citing *Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1327 n.2 (11th Cir. 2002) (emphasis added)); *Jobin v. McKay (In re M & L Bus. Mach. Co.*), 84 F.3d 1330, 1331 n.1 (10th Cir. 1996) (same) (emphasis added).

Here, the Ponzi scheme presumption cannot apply for two reasons: First, BLMIS was not a Ponzi scheme. To the contrary, it was, perhaps, the largest single trader in securities in the world. BLMIS employed 200 people, 94% of whom conducted trades equal to 10% of the daily volume on the New York Stock Exchange for customers like Bear Stearns, Schwab, and Fidelity.

*See* Randall Smith, *Wall Street Mystery Features a Big Board Rival*, THE WALL STREET JOUR-

NAL, Dec. 16, 1992.  As stated by one commentator:

> In 2008, BLMIS had $700 million of equity capital and handled
> approximately 10% of the NYSE trading volume. Its 200 employ-
> ees (100 people in trading, fifty in technology, and fifty in the back
> office) were divided between New York and London, but only
> twelve of them were assigned to the famous split-strike conversion
> strategy devised by Madoff.[6]

Of BLMIS' 200 employees, only 12 were involved in a dishonest side business where customers

were defrauded as to the investment of their funds.  But the fact that Defendants were defrauded

does not make BLMIS a Ponzi scheme.

Second, the Defendants were not equity investors in BLMIS any more than a person

whose IRA is managed by J.P. Morgan Chase is an equity investor in J.P. Morgan Chase.  Ber-

nard L. Madoff was the only member of BLMIS.  The Defendants had no equity interest in

BLMIS.  They had a debtor-creditor relationship with BLMIS in precisely the same way that a

depositor has a debtor-creditor relationship with his bank.  *See U.S. v. Manufacturers Trust

Co.*, 198 F.2d 366, 367 (2d Cir. 1952) ("The relationship between the bank and its depositor is

that of debtor and creditor.") (citation omitted).

Finally, the smoking gun in this case is the fact that customers' money was used to pur-

chase securities in BLMIS' legitimate trading operation.  The Trustee's own expert has admitted

that customers' money was deposited "directly and indirectly" into the BLMIS trading accounts.

*In re Bernard L. Madoff*, No. 08-01789, ECF No. 524 (Declaration of Joseph Looby in Support

of Trustee's Motion for an Order Upholding Trustee's Determination . . . of Net Equity) at ¶¶ 9,

17, 18, 19, 26, 27.)  The fact that BLMIS conducted actual trades was confirmed by a trade con-

---

[6] Greg N. Gregoriou and Francois-Serge Lhabitant, *Madoff: A Riot of Red Flags*, Jan.
2009, p. 7, available at <http://faculty-research.edhec.com/jsp/fiche_document. jsp?CODE=
123477034 4525&LANGUE=1>.

firmation ticket produced by the Trustee.[7]  Indeed, although there has been no discovery in these

cases, the records may show that customers' money was used to purchase the very securities

shown on their confirmations and monthly statements.

### VIII.    The Trustee's Complaints Violate New York Public Policy

As the Supreme Court held in *Butner v. United States*, 440 U.S. 48, 54-55 (1979), the de-

termination of property rights in a bankruptcy proceeding is governed by state law.

> Property interests are created and defined by state law.  Unless
> some federal interest requires a different result, there is no reason
> why such interests should be analyzed differently simply because
> an interested party is involved in a bankruptcy proceeding.  Uni-
> form treatment of property interests by both state and federal
> courts within a State serves to reduce uncertainty, to discourage fo-
> rum shopping, and to prevent a party from receiving 'a windfall
> merely by reason of the happenstance of bankruptcy.'

*Id.* at 55 (quoting *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609 (1961)).

*Butner* held that a creditor must be "afforded in federal bankruptcy court the same protec-

tion he would have under state law if no bankruptcy had ensued."  *Id.*  The Court rejected the

view that the onset of bankruptcy permitted "undefined considerations of equity" to contravene

state law.  *See id.* at 56.  *Butner* has been followed by numerous courts.  *E.g.*, *BFP v. Resolution

Trust Corp.*, 511 U.S. 531, 544-45 (1994) ("*BFP*") (refusing to avoid state foreclosure sale as

fraudulent under 11 U.S.C. § 548 because state law precluded Trustee's avoidance claim and

"the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law"

unless Congress's intent to the contrary is "'clear and manifest'"); *Barnhill v. Johnson*, 503 U.S.

393, 399-400 (1992) (relying upon UCC to determine when "transfer" by check occurred for

purposes of preference avoidance); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195-98

(S.D.N.Y. 2002) (dismissing claims of intentional fraudulent transfer because Regulation T of

---

[7] Chaitman Decl., Ex. 5 (Trade Ticket.)

federal securities laws precluded debtor from having interest in transferred property; recognizing that "[b]ankruptcy does not provide a forum for the realignment of rights . . . but serves only as a forum for the recognition of rights already acquired."') (internal citation omitted).  If, as the Trustee wishes, this Court could change substantive legal rights, no one could be confident of the legal status of his actions.  As the Court explained in *BFP,* if the commencement of a bankruptcy case caused the validity of a foreclosure sale to be questioned, "[t]he title of every piece of realty purchased at foreclosure would be under a federally created cloud." *BFP*, 511 U.S. at 544.

A critical objective served by this framework is commercial certainty.  For example, the *BFP* Court expressed its concern that, if the commencement of a bankruptcy case caused the validity of a foreclosure sale to be questioned, "[t]he title of every piece of realty purchased at foreclosure would be under a federally created cloud."  511 U.S. at 544. Similarly, as the New York Court of Appeals has recognized in answering questions certified to it by the Second Circuit that:

> "to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear.

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 372 (1991) (quoting *Hatch v. Fourth Nat'l Bank*, 147 N.Y. 184, 192 (1895)).

In 2011, once again on a certified question from the Second Circuit, the New York Court of Appeals in *Commodities Future Trading Commission v. Walsh*, 17 N.Y.3d 162 (2011), addressed the issue of clawing back fraudulently acquired funds from an innocent recipient.  In *Walsh*, the funds in question were generated by Ponzi schemer defendant Stephen Walsh.  The SEC and Commodities Futures Trading Commission (the "Agencies") sought to claw back funds from Walsh's ex-spouse that she had received as part of a divorce settlement from Walsh.  The

funds had been misappropriated by Walsh as part of a Ponzi scheme in which he was engaged, and involved funds he had managed which totaled in excess of $550 million. There was no indication that Walsh's former spouse had any knowledge of Walsh's Ponzi scheme or his fraud. The New York Court of Appeals, rejected the Agencies' clawback claim against the innocent spouse citing, *Banque Worms* and noting: "[a]t its core, [New York's] rule favoring innocent transferees of stolen funds over defrauded owners is rooted in New York's 'concern for finality in business transactions.'" *Walsh*, 17 N.Y.3d at 173 (citing *Banque Worms*, 77 N.Y.2d at 372.) The court concluded that similarly, in the matrimonial realm, "[t]o hold that the proceeds of fraud acquired by one spouse unbeknownst to the other cannot be subject to equitable distribution or conveyed through a settlement agreement as marital property would undermine . . . finality." *Id.*

Similarly, the securities markets would be in utter chaos if customers of an SEC-regulated broker/dealer could not rely on the rights established by non-bankruptcy law when they engage in transactions with their broker. As the Second Circuit noted, "certainty and predictability are at a premium" in the area of law governing securities transactions. *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F. 3d 327, 336 (2d Cir. 2011). Thus, the Complaints must be dismissed.

Thus, the Complaints should be dismissed as violative of New York public policy.

## IX.    The Trustee's Claims to Avoid Obligations Must be Dismissed

In some of the Complaints, the Trustee seeks to avoid "obligations" that BLMIS incurred to the Defendants. (*See e.g.,* RAR Am. Compl. ¶ 41.) The Trustee's attempt to void "obligations incurred" by BLMIS is irreparably flawed for the reasons set forth below.

### A.    SIPA Does Not Authorize Avoidance of Obligations

The Trustee bases all of his challenges to obligations on §§ 548(a) and 544(b) of the Code, and §§ 78fff(b) and 78fff-1(b) of SIPA. (*Id.*) None supports the avoidance of obligations.

SIPA provides that "[w]henever customer property is not sufficient to pay in full [customer] claims . . . , the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11 of the United States Code."  15 U.S.C. § 78fff-2(c)(3) (emphasis added).  This provision only allows the Trustee to recover "property."  It does not allow the Trustee to avoid obligations.  The statutory language controls its application unless demonstrably at odds with the intent of the draftsmen.  *Ron Pair Enters., Inc.*, 489 U.S. at 241.  Here, the language of the statute is clear on its face and the Court must apply the statute as written without consulting other aids to its construction.  *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291, 296 (2006); *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 224 (1st Cir. 2003); *see also Picard v. HSBC Bank PLC*, 454 B.R. 25, 30 (S.D.N.Y. 2011).

This limitation is consistent with SIPA's purpose, which is to marshal customer property for distribution to customers.  *See In re Gov't Sec. Corp.*, 972 F.2d 328, 331 (11th Cir. 1992) ("The purpose of SIPA is to return to customers of brokerage firms their property or money.").  Avoiding an obligation simply renders it unenforceable.  *See In re Asia Global Crossing*, 333 B.R. 199, 202-03 (Bankr. S.D.N.Y. 2005) (noting that when an obligation is avoided the "obligation is rendered unenforceable, there is nothing to return" to the estate).  This does not result in any increase in customer property for distribution.

Under controlling rules of statutory construction, § 78fff-2(c)(3) takes precedence over any other generalized grant of avoidance powers to the Trustee.  *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957) ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the

same enactment."); *accord Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992) (noting that a basic maxim of statutory construction is that the specific governs the general).

### B.  The Trustee Cannot Avoid Obligations that Arise By Law

The Trustee seeks to avoid obligations evidenced by the BLMIS statements and confirmations issued to customers.  The Trustee cannot use the avoidance of obligations to avoid the claims asserted by the Defendants as those obligations are not voluntary or contractual, but arise by operation of federal and state statutes, regulations and laws.

It is clear from the case law that the term "obligation" as used in § 548(a)(1)  refers to voluntary contractual obligations between the debtor and a third party.  *See U.S. Bank N.A. v. Verizon Communs., Inc.*, 2012 WL 3100778, *5 (N. Tex. July 31, 2012) ("While the Code does not define the term 'obligation,' one court has understood it to mean '[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract.'") (quoting *Asia Global Crossing*, 333 B.R. at 203 (internal quotation omitted)); *In re Foxmeyer Corporation*, 290 B.R. 229, 234 (Bankr. D. Del. 2003) (a guarantee is an obligation).  Moreover, § 548(a) generally requires the debtor's intent to incur the obligation.

Obligations that arise by statute or regulatory process, as opposed to contractual bargaining between the parties, are not avoidable obligations.  *See In re Nextwave Pers. Communications, Inc. v. FCC*, 200 F3d 43, 55 (2d Cir. 1999) ($4.74 billion obligation to the FCC could not be avoided as fraudulent transfers because the obligation was incurred as a part of the FCC's system for allocating spectrum licenses); *Southeast Waffles, LLC v. IRS (In re Southeast  Waffles, LLC )*, 702 F.3d 850 (6th Cir. 2012) ("Tax penalties arise not through contractual bargaining but by operation of statute, and no value is or can be given in exchange. It would defy common sense

{N0034772 15 }                                            32

to find that debtors could avoid such penalties when the IRS was doing only what the tax statutes require.").

BLMIS' obligations to the Defendants arose from federal securities statutes and state law. For instance, each of the defrauded BLMIS customers has a Rule 10b-5 claim against BLMIS. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006) ("[A] broker who accepts payment for securities that he never intends to deliver or who sells customer securities with the intent to misappropriate the proceeds violates § 10(b) and Rule 10b-5."). Defendants also hold substantive state law remedies, such as claims for common law fraud and breach of fiduciary duty, which allow for compensatory damages and the right to interest at the statutory rate of interest. *See* N.Y. C.P.L.R. § 5001(a). Since the obligations to the Defendants arise under statutory framework, not from the contractual relationship between BLMIS and the Defendants, they are not subject to avoidance.

### C.  <u>The Complaints Fail to Adequately Plead the Obligations to be Avoided</u>

The Complaints do not identify any particular fraudulent obligations to be avoided.  (*See e.g.*, RAR Am. Compl. ¶¶ 41-43.)  Their conclusory allegations, which are no more than a re-statement of the provisions of the Code, are legally insufficient to support avoidance.  *See* Fed. R. Civ. P. 9(b) (made applicable by Fed. R. Bankr. P. 7009).  "At a minimum, the complaint must be sufficiently specific to give the defendant full notice of the claims that are being asserted and to allow the defendant to prepare an adequate answer, with affirmative defenses and counterclaims."  5 COLLIER ON BANKRUPTCY ¶ 548.11[1][a][ii] (16th ed. 2011); *see also Fannie Mae v. Olympia Mortg. Corp.,* 2006 WL 2802093, at *9 (E.D.N.Y. Sept. 28, 2006) (complaint "does not identify how many transfers plaintiff is challenging or the specific dates and amounts of those transfers").  Since the Trustee merely recites the statute in his claims to avoid obligations,

Defendants are unable to ascertain from the Complaints what obligations the Trustee seeks to avoid or what defenses may apply. Accordingly, these claims must be dismissed.

### D. The Trustee Cannot Avoid Transfers Made Or Obligations Incurred Before The Reach-Back Period

The Complaints apparently seek to avoid all obligations BLMIS incurred over the life of the customer-broker relationship. Even if SIPA encompassed the avoidance of obligations – which it does not – the Trustee's power to reach them (as well as to reach transfers) would be circumscribed by the applicable statutory reach-back period. To the extent that the claims seek to avoid obligations incurred beyond the applicable "reach back" period, they must be dismissed. *See Asia Global Crossing*, 344 B.R. at 256 (rejecting trustee's "use of a time-barred right to avoid a fraudulent obligation as a defense to the underlying claim"); *O'Toole v. Karmani (In re Trisnum Group, Inc.)*, 460 B.R. 379, 388 (Bankr. S.D.N.Y. 2011) ("Since the notes were executed outside of the two-year reach-back period, the Distributing Agent cannot seek to avoid the obligations the Debtors owe to the defendants on account of these notes.").

### E. The Trustee Cannot Avoid Obligations Already Satisfied

Courts analyzing the term "obligation" hold that "[i]n most situations, [an] 'obligation' will impose a 'debt' on the obligor, and give a 'claim' to the obligee." *Asia Global Crossing*, 333 B.R. at 203; *see Nextwave*, 200 F.3d at 56 ("Generally an obligation is incurred when a debtor becomes legally obligated to pay.").

Defendants' BLMIS account withdrawals satisfied obligations BLMIS owed Defendants. Once those obligations were satisfied, the "debt" ceased to exist and there was no longer an "obligation." (*See e.g.,* RAR Am. Compl., Ex. B.) The Trustee cannot avoid obligations that no longer exist, and cannot go back in time to retroactively avoid obligations that have already been satisfied. Indeed, the Code provides for avoidance of obligations because, "[j]ust as avoiding a

transfer brings back assets to the estate to increase distributions, avoiding an obligation decreases the claims against the already existing estate assets, which then proportionately increases creditor dividends." 5 COLLIER ON BANKRUPTCY ¶ 548.03[4][a]. The Trustee's claims would not serve that purpose since the Trustee has rejected the Defendants' claims.

## X.    The Trustee Improperly Combines Accounts

The Complaints must be dismissed where the Trustee improperly combines accounts that must be treated as separate accounts under SIPA, combines claims against both accounts in each count against all Defendants, and fails to specify the recipient of the allegedly fraudulent transfers with the requisite particularity. (*See e.g.*, *Picard v. Gertrude Alpern Revocable Trust*, No. 10-ap-04327 (BRL), ECF No. 1 (Bankr. S.D.N.Y. Nov. 26, 2010) (the "Alpern Complaint").

### A.    <u>SIPA Rules Require That Accounts Be Treated Separately</u>

The Complaints in which the Trustee combines accounts must be dismissed because they combine unrelated accounts that SIPA requires to be treated separately. The Trustee is obligated to conduct the proceeding consistent with SIPA and its Rules. SIPA incorporates select portions of the Code for purposes of the liquidation proceeding, but only "to the extent consistent with the provisions" of SIPA. *See* 15 U.S.C. § 78fff(b). Similarly, a trustee's duties are the same duties as a trustee in a chapter 7 case, but only to the extent consistent with the provisions of SIPA. *See* 15 U.S.C. § 78fff-1(b). Separate treatment of defined accounts is a basic premise of SIPA. In one of its most important provisions, SIPA provides that "a customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity" for purposes of distribution. *See* 15 U.S.C. § 78fff-3.

The Rules governing the definition of accounts that qualify as SIPA customer accounts specify which accounts and persons related to those accounts must be treated separately. Section 300.100(b) states: "Accounts held by a customer in different capacities, as specified by these

rules, shall be deemed to accounts of "separate customers." 17 C.F.R. § 300.100(b).  Trust accounts qualify as separate customers distinct from the trustee, settler or any beneficiary.  *See* 17 C.F.R. § 300.104(b) ("A qualifying trust account held with a member shall be deemed a separate customer of the member, distinct from the trustee, the testator or his estate, the settler or any beneficiary of the trust.").

The Trustee ignores the provisions of SIPA and the Rules in these actions and combines accounts and claims, aggregating transfer amounts against completely separate trust accounts and one individual account.  Accordingly, there is no legal justification for combining the accounts in each count of the Complaints.

### B.  The Claims Do Not Meet the Pleading Requirements

In the Complaints where the Trustee improperly combines accounts, the claims against the Defendants in each count are not properly alleged with sufficient factual detail and therefore do not meet the pleading requirements of Rule 8(a) made applicable by Bankruptcy Rule 7008(a).  For instance, in the Alpern Complaint, the Trustee names multiple defendants in addition to three customers identified in Exhibit A to the Complaint but does not link any specific Defendant to any specific alleged transfer.  In cases where fraud is asserted, the failure to distinguish among defendants is fatal.  Rule 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act.  *See American Image Motor Co., Inc.,* 36 F. Supp. 2d 628, (S.D.N.Y. 1999).  Absent the necessary specific details, the Trustee's claims are legally insufficient and must be dismissed.

## XI.   The Trustee's Subsequent Transfer Claims Should be Dismissed

In some of the Complaints, such as the RAR Amended Complaint, the Trustee asserts claims against certain Defendants as a subsequent transferee under § 550(a)(2) of the Code for the recovery of purported, but wholly unspecified, subsequent transfers.  These subsequent trans-

fer claims are legally defective and subject to dismissal for two reasons. First, they are not properly alleged with sufficient factual detail to render them plausible on their face and they, therefore, do not meet the pleading requirements of Rule 8(a). Second, the claims pervert the traditional concept of "subsequent transferee" liability. The Trustee must also establish that the transfer may be avoided as against the initial transferee before pursuing subsequent transferee claims.

### C. The Claims Against Subsequent Transferees are not Adequately Pled

This Court has already recognized that threadbare allegations of subsequent transferee liability are insufficient to state a claim. In *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011), the court held that subsequent transfer claims lacking "even a modicum of specificity" must be dismissed. *Id.* at 120. In language equally applicable here, the court instructed that:

> While the Complaint's failure to indicate specific amounts does not in and of itself warrant dismissal of the Subsequent Transfer claims, its <u>failure to provide even a modicum of specificity with respect to the Subsequent Transfers so as to put the Defendants on notice as to which ones the Trustee seeks to recover does</u> so warrant.

*Id.* (internal citations omitted; emphasis added).

The Trustee's subsequent transfer allegations here are just as deficient as in *Madoff*. There, the Trustee's complaint "merely allege[d] that '[o]n information and belief, some or all of the transfers were subsequently transferred by one or more [of the Defendants] to another Family Defendant, either directly or indirectly' without providing any sort of estimate of the amount of the purported Subsequent Transfer, or when or how such Transfer occurred." *Id.* at 119. Here, the Trustee's subsequent transfer claims are similarly speculative and lacking in factual detail. (*See e.g.*, RAR Am. Compl. ¶¶ 2-3, 103-05.)

The Complaints involving subsequent transfer claims do not identify any dates or amounts of any alleged subsequent transfers, let alone any details about how the transfers purportedly occurred. Moreover, aside from general identification of the Defendants, the Complaints do not link any specific Defendant to any specific alleged initial or subsequent transfer(s). In cases where fraud is asserted, the failure to distinguish among defendants is fatal. *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) ("[W]here a case involves multiple defendants, F.R.C.P. 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act") (citing *See Ellison v. American Image Motor Co., Inc.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999).

The allegations pertaining to the subsequent transferees are conclusory, bald assertions that lack "any sort of estimate of the amount of the purported [s]ubsequent [t]ransfer, or when or how such [t]ransfer occurred." *Madoff*, 458 B.R. at 119. Absent the necessary specific details, the Trustee's subsequent transferee claims are legally insufficient. *See Gowan v. Amaranth LLC (In re Dreier LLP)*, 452 B.R. 451, 464 (Bankr. S.D.N.Y. 2011) ("[T]he complaint [must] contain the 'necessary vital statistics -- the who, when, and how much' of the purported transfers to establish an entity as a subsequent transferee of the funds."). The details missing here are critical because a subsequent transferee will only be liable for the property of the estate that **it** wrongfully received. *Picard v. Cohmad Sec. Corp*, 454 B.R. 317, 340 (Bankr. S.D.N.Y. 2011).

### D.  The Trustee Cannot Convert Subsequent Transferees into Beneficiaries of an Initial Transfer

In addition to the basic deficiencies in the pleadings described above, the Complaints that allege subsequent transferee claims blur the important distinction made by § 550(a) between initial and subsequent transferees. Section 550 identifies three potential sources from which the

Trustee may recover all or part of an avoidable transfer:  § 550(a) provides for recovery from

two possible entities:  (i) the initial transferee and (ii) an entity for whose benefit the initial trans-

fer was made.  *See* 11 U.S.C. § 550(a)(1).  This section provides a means for the Trustee to hold

either of those targets liable for the entirety of the avoided initial transfer (but subject to the §

548(c) defense, for example).  Section 550(b) provides for recovery from a third source: a subse-

quent transferee.  Unlike transferees under § 550(a), subsequent transferees have a defense to

recovery under § 550(b) if they (1) took for value, including satisfaction or securing of a present

or antecedent debt; (2) in good faith; and (3) without knowledge of the voidability of the initial

transfer by the debtor.  *See* 11 U.S.C. § 550(b).

The value paid by a subsequent transferee need only be sufficient to support a simple

contract, similar to protections provided to *bona fide* purchasers for value under various state

laws.  Value, in contrast to value in § 548(c) is the value given to the transferor, not the debtor

or, in this case, BLMIS.  *See Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 897 (7th

Cir. 1988) ("Transferees and other purchasers generally deal only with the previous person in

line; they give value, if at all, to their transferors (or the transferors' designees).

The statute emulates the pattern of other rules protecting good faith purchasers. All of the

courts that have considered this question have held or implied that value to the transferor is suffi-

cient.") (citations omitted).  The classic example of an entity for whose benefit a transfer is made

is a guarantor who receives the benefit of a transfer but not the property.  *See Christy v. Alexan-*

*der & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson &*

*Casey)*, 130 F.3d 52, 57 (2d Cir. 1997) ("[W]e know that the 'entity for whose benefit' phrase

does not simply reference the next pair of hands; it references entities that benefit as guarantors

of the debtor, or otherwise, without ever holding the funds."); *SIPC v. Stratton Oakmont, Inc.,*

234 B.R. 293, 313 Bankr. S.D.N.Y. 1999) ("The quintessential example of the entity who bene-fits from the initial transfer is a guarantor of the debtor. . . . He or she is relieved of the obliga-tion to pay the lender -- which is the benefit -- while the lender receives the money.").

The Trustee attempts to bypass the protections afforded subsequent transferees by plead-ing that they are also beneficiaries of the initial transfer:

> To the extent funds transferred from BLMIS were for the benefit of the Subsequent Transferee Defendants, Subsequent Transferee Defendants are the initial transferees of such transfers and are in-cluded in the definition of Defendants for purposes of the allega-tions herein.

(*See e.g.,* RAR Am. Compl. ¶ 3.)

But these allegations fail because a *later recipient* of an initial transfer is a subsequent transferee, not an initial transferee or a beneficiary of the initial transfer. *See In re Bullion Re-serve of N. Am.*, 922 F.2d 544, 548 (9th Cir. 1991) ("A subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually re-ceives a benefit from the initial transfer."); *Bonded*, 838 F.2d at 895 (same).

Moreover, the Trustee fails to allege any facts supporting the allegation that funds were, in fact, transferred for the benefit of the subsequent transferee defendants, such as the basis for the beneficiary status or which transfers were purportedly received. *Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 478 (Bankr. S.D.N.Y. 2011) (dismissing as "conclusory and speculative" claims that an alleged subsequent transferee was also a beneficiary). The im-plication of the Trustee's assertions is that any benefit, however indirect or incidental, is suffi-cient to transform an entity into a "beneficiary" within the meaning of § 550(a)(1) and thereby hold them responsible for the entire amount of the initial transfer. To the contrary, "[t]he benefit must be direct, ascertainable and quantifiable and must correspond to, or be commensurate with, the value of the property that was transferred." *Enron Creditors Recovery Corp. v. J.P. Morgan*

*Sec. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17, 33 (Bankr. S.D.N.Y. 2009) (internal

quotation omitted), *rev'd on other grounds*, *Alfa S.A.B. de C.V. v. Enron Creditors Recovery*

*Corp. (In re Enron Creditors Recovery Corp.)*, 422 B.R. 423 (S.D.N.Y. 2009).

## XII.    The Trustee Cannot Disallow Unidentified Related Claims

The district court withdrew the reference to determine whether § 502(d) was inconsistent

with SIPA and held that it was not. *In re Madoff Sec.*, 12 MC 115, (S.D.N.Y. 2011) ECF No.

155; 435.  However, the issue before the district court was whether § 502(d) could be applied in

a SIPA proceeding to prevent payments from one account when there was a fraudulent transfer

claim pending against the same account. The district court did not consider or address whether §

502(d) could be applied to disallow different claims of different customers.

Section 502(d), as the Trustee has applied it in some cases against different customers

(*see e.g.*, *Picard v. Bert Brodsky Associates, Inc. Pension Plan*, 10-ap-05148 (BRL), ECF No. 1

(Bankr. S.D.N.Y. Dec. 2, 2010)), is inconsistent with the provisions of SIPA, its goals and its

Rules.  The goal of a SIPA liquidation is to protect the interests of customers by promptly dis-

tributing available property and funds to satisfy net equity claims. *See* 15 U.S.C. §§ 78ffff(a)

(1)(B) and 78fff-2(b).  In particular, SIPA provides that "a customer who holds accounts with the

debtor in separate capacities shall be deemed to be a different customer in each capacity" for

purposes of distribution. *See* 15 U.S.C. 78fff-3.  In *Brodsky*, the account named in the Complaint

is separate from the account held hostage by the Trustee to satisfy transfers.  Accordingly,  §

502(d) is inconsistent with both the policy and provisions of SIPA and should not be applied to

disallow claims of a different customer.

## XIII.    Applicable Non-Bankruptcy Law Protects Transfers and Distributions from Defendants' Accounts

Some of the Defendants' BLMIS accounts are in the name of an irrevocable trust.  (*See e.g.*, *Picard v. Trust For the Benefit of Ryan Tavlin*, No. 10-ap-05232 (BRL), ECF No. 1, ¶ 7 (Bankr. S.D.N.Y. Dec. 6, 2010).)  Pursuant to applicable law, such an account is exempt from the claims of judgment creditors such as the Trustee.  "[I]t is well settled that exemption provisions are to be construed liberally."  *Morgan v. Gordon*, 450 B.R. 402, 405 (W.D.N.Y. 2011) (holding that annuity and proceeds were exempt); *see also In re Keil*, 88 F.2d 7, 8 (2d Cir. 1937) (exempting life insurance policy and dividends therefrom and noting that "exemption statutes are to be liberally construed"); *In re Glenn*, 430 B.R. 56, 58 (Bankr. N.D.N.Y. 2010) ("Exemption statutes are to be construed liberally in favor of a debtor.  [I]t is the Trustee who bears the burden of proof to establish that the exemption is improper.").

The irrevocable trust accounts targeted by the Trustee are statutorily protected from the Trustee's avoidance claims.  Section 5205 of the CPLR identifies categories of personal property that are specifically protected from judgment creditors' claims.  "In general they are what the legislature deems to the necessities of life, which not even a person's judgment creditors should be allowed to reach."  David D. Siegel, New York Practice § 490 (5th ed. 2011).  Irrevocable trusts, such as the *Trust For the Benefit of Ryan Tavlin* are exempt from the Trustee's claims because "all  property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is exempt from application to the satisfaction of a money judgment."  *See* N.Y. C.P.L.R. § 5205(c). The exemption is subject to a limited exception:  additions to trusts are not shielded from judgment creditors if "deemed to be [a] fraudulent conveyance[] *under article ten of the*

*debtor and creditor law.*" N.Y. C.P.L.R. § 5205(c)(5) (emphasis added).[8]  That exception, how-ever, is inapplicable in this case as a result of the district court's determination that § 546(e) lim-its the Trustee to avoidance claims under § 548(a)(1) of the Code.  *See Greiff*, 476 B.R. at 722.  Accordingly, this exception does not benefit the Trustee because no state law avoidance claim remains.[9]

As N.Y. C.P.L.R. 5205(c)(5) only contemplates a carve-out for fraudulent conveyances under state law, and the Trustee no longer has any such claims, the Trustee's claims for avoid-ance of distributions from the Defendants' trust accounts must be dismissed. Furthermore, the statute provides an exemption to a judgment creditor for "additions" to such an account.  The additions to the accounts in these cases were deposits made by the customer and are not the sub-ject of avoidance by the Trustee.  The withdrawals by the customer are not covered by the excep-tion in N.Y. C.P.L.R. 5205(c)(5) and are exempt from the Trustee's claims.  *See* N.Y. C.P.L.R. 5202(d).

---

[8] CPLR(c)(5) states "Additions to an asset described in paragraph two of this subdivision shall not be exempt from application to the satisfaction of a money judgment if (i) made after the date that is ninety days before the interposition of the claim on which such judgment  was  entered, or (ii) deemed to be fraudulent conveyances under article ten of the debtor and creditor law." (emphasis added).

[9] In a footnote to the *Greiff* decision, the court observed that a defendant could not avail himself or herself of the protection under N.Y. C.P.L.R. 5205(c)(2) because the statute "specifically provides that the exemption does not apply to 'additions to' the trust that are 'fraudulent conveyances.'" 476 B.R. at 729 n.13 (emphasis added). However, in so ruling, the court (i) completely overlooked the express language of 5205(c)(5) which limits the exclusion to "fraudulent conveyances under article ten of the debtor and creditor law," CPLR 5205(c)(5) (emphasis added), and (ii) did not consider the fact that the statute's protections extend to withdrawals from, not just additions to, the IRA, other qualified retirement account or trusts. The defendants whose cases were covered by the decision have not waived their right to appeal the district court decision in the matter.

**XIV.   The Trustee's Actions Against Charitable Trusts Violate Free Exercise of Religion**

The Trustee's application of fraudulent transfer laws to entities established for religious and charitable contributions violates the laws and policies protecting those donations.  In enacting the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. §2000bb-4, Congress  recognized that neutral laws might interfere with religion and that the government should not burden religious exercise without a compelling justification.  Accordingly, pursuant to RFRA, if a statute could be construed to be restrictive of religious freedom, the government would have to show that the law furthers a compelling interest and that the law was tailored narrowly to minimize the impact on religion.  The fraudulent transfer provisions of the Code, when applied to recover donations made to religious organizations, ran afoul of RFRA.  In response, Congress enacted the Religious Liberty and Charitable Donation Act of 1998 ("RLCDPA") to protect donations to religious and other charitable institutions by a debtor from attack by a trustee seeking to recover such donations as fraudulent transfers.  Section 548(a)(2), as amended by RLCDPA and the subsequent clarification act, provides the protection for contributions from a debtor within certain limits:

> A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which –
>
> (A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or
>
> (B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.

11 U.S.C. § 548(a)(2).

{N0034772 15 }                              44

President Clinton, signing the act into law, emphasized that the protection was necessary to support the valuable role religious and charitable institutions play in the country.

The Complaints against charitable institutions violate the RFRA and the principles underlying RLCDPA and he has so recognized in entering into the sweetheart settlement with Jeanne Levy-Church and Francis Levy, the heirs of Madoff co-conspirator, Norman Levy.  In that situation, the Trustee did not seek recovery of the amounts paid by the family's charitable foundation from its BLMIS accounts to charities.  *See In re Bernard L. Madoff*, No. 08-01789, ECF No. 1833, ¶12 (Bankr. S.D.N.Y. Jan. 27, 2010.)  The Trustee argued that the pursuit of the Levy's charitable foundation was fruitless because of the lack of significant assets.  *Id.* at 20.  The Trustee should apply the same analysis to all the other charitable trust Defendants.

## <u>CONCLUSION</u>

The Defendants respectfully request that the Court dismiss the Complaints.

November 1, 2013

**BECKER & POLIAKOFF LLP**

By: <u>/s/ Helen Davis Chaitman</u>
Helen Davis Chaitman
Peter W. Smith
Julie Gorchkova
45 Broadway
New York, NY 10006
(212) 599-3322
HCHAITMAN@BECKERNY.COM
*Attorneys for Defendants*